Docket No. 91547.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROY I. CABALLES, Appellant.

*Opinion filed May 18, 2006.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald and Karmeier concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justices McMorrow and Kilbride.

## OPINION

On January 24, 2005, the Supreme Court of the United States vacated this court's judgment in *People v. Caballes*, 207 Ill. 2d 504 (2003) (*Caballes I*), and remanded the cause for "further proceedings not inconsistent with this opinion." *Illinois v. Caballes*, 543 U.S. 405, 410, 160 L. Ed. 2d 842, 848, 125 S. Ct. 834, 838 (2005). Both the Supreme Court and this court in its now-vacated judgment considered only defendant's fourth amendment claim. However, in his original brief to this court, defendant also relied on article I, section 6, of the Illinois Constitution of 1970. Ill. Const. 1970, art. I, §6. Therefore, we must now consider whether, even though the canine sniff of defendant's car during a routine traffic stop did not implicate the fourth amendment, it nevertheless violated the guarantees of the state constitution.

We have allowed defendant's motion to permit additional briefing of the state constitutional issues. In addition, we have permitted the Illinois State Bar Association (ISBA), with the Office of the Cook County Public Defender, and the American Civil Liberties Union of Illinois (ACLU), with a number of other organizations, to file briefs *amici curiae* on behalf of the defendant. 155 Ill. 2d R. 345.

## BACKGROUND

The facts surrounding defendant's arrest are described in detail in our earlier opinion. *Caballes I*, 207 Ill. 2d at 506-08. In brief, defendant was stopped on an interstate highway by an Illinois state trooper for the offense of speeding. The trooper radioed the police dispatcher to report that he was making a stop. Before he began to write the ticket, he again radioed the police dispatcher to determine whether defendant's license was valid and to check for outstanding warrants.

When the trooper first radioed the police dispatcher to report the stop, a second trooper heard the transmission and immediately responded to the scene. The second trooper, a member of the Illinois State Police Drug Interdiction Team, was accompanied by a dog trained to detect narcotics. He and the dog arrived and walked around defendant's car while the first trooper was in the process of writing a warning ticket. The dog

alerted at the trunk. A search of the trunk revealed marijuana and defendant was placed under arrest. Approximately 10 minutes elapsed between the stop and the arrest.

The trial court denied defendant's motion to suppress evidence and quash arrest. After a bench trial, defendant was convicted of cannabis trafficking (720 ILCS 550/5.1(a) (West 1998)), sentenced to a term of 12 years in prison, and ordered to pay a street-value fine of $256,136. The appellate court affirmed, holding that the police are not required to have reasonable suspicion before conducting a canine sniff and that although the license and warrant check improperly extended the duration of the stop in this case, the resulting delay was *de minimis*. *People v. Caballes*, No. 3–99–0932 (2001) (unpublished under Supreme Court Rule 23).

This court reversed, with three justices dissenting. Relying on *People v. Cox*, 202 Ill. 2d 462, 470-71 (2002), this court held that when a canine sniff is "performed without ' "specific and articulable facts" ' to support its use," it unjustifiably enlarges "the scope of a routine traffic stop into a drug investigation." *Caballes I*, 207 Ill. 2d at 510. Without addressing the appellate court's conclusion that duration of the stop was not unjustifiably prolonged, this court concluded that the evidence should have been suppressed. The dissenting justices, relying on *City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000), would have affirmed on the basis that a canine sniff is not a search. *Caballes I*, 207 Ill. 2d at 512 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.).

Although this court did not expressly state that it was conducting its analysis solely under the fourth amendment to the United States Constitution, it did state that it was applying the principles of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), as it had previously done in other cases involving routine traffic stops. *Caballes I*, 207 Ill. 2d at 508. The majority implicitly and the dissent explicitly (*Caballes I*, 207 Ill. 2d at 514 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.)), relied on fourth amendment jurisprudence. In *Caballes I*, this court gave no consideration to defendant's argument that the evidence against him should have been

suppressed under the provisions of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §6).

The Supreme Court of the United States granted the State's petition for a writ of *certiorari*. Proceeding from the premise that the "duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop" (*Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 846-47, 125 S. Ct. at 837), the Court framed the issue as whether a dog sniff, otherwise conducted in a reasonable manner, changes the character of a traffic stop that is lawful at its inception. *Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837.

The Court answered this question in the negative. Official conduct does not constitute a search for fourth amendment purposes unless it compromises a legitimate interest in privacy. Because an individual's interest in possessing contraband cannot be deemed legitimate, official conduct that merely reveals the possession of contraband does not compromise a legitimate privacy interest. *Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837. A canine sniff by a dog trained to detect the presence of narcotics discloses only the presence or absence of contraband and, therefore, "does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838. The Court noted that this analysis is consistent with its earlier decision that the use of thermal-imaging equipment to detect the growing of marijuana plants inside a home is an unlawful search. Unlike the canine sniff, which will not reveal noncontraband items of a private nature, thermal imaging may reveal "intimate details" within a home, such as conduct in the bedroom or bathroom. *Caballes*, 543 U.S. at 409-10, 160 L. Ed. 2d at 848, 125 S. Ct. at 838, citing *Kyllo v. United States*, 533 U.S. 27, 150 L. Ed. 2d 94, 121 S. Ct. 2038 (2001).

ISSUES

Defendant makes three separate claims on remand. First, he argues that this court should not continue to interpret and apply the search and seizure provision of article I, section 6, of

the Illinois Constitution of 1970 in lockstep with the United States Supreme Court's interpretation and application of the search and seizure clause of the fourth amendment to the United States Constitution. Second, defendant asserts that unless the police have probable cause or reasonable suspicion, the use of a canine sniff during a routine traffic stop violates the privacy clause of article I, section 6, of the Illinois Constitution of 1970. Third, defendant claims that the evidence obtained as a result of the dog sniff should be suppressed because the technique is not sufficiently reliable.

## Standard of Review

Defendant proposes *de novo* review on the basis that this is the proper standard of review of a trial court's "ultimate finding of probable cause or reasonable suspicion," citing *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001).

As for the first two issues raised by defendant, *de novo* review is appropriate, but not for the reason stated by defendant. We are asked to consider whether to abandon or reaffirm the lockstep doctrine and whether the right to privacy guaranteed by the state constitution is implicated by a dog sniff of a car during a routine traffic stop. These are questions of law, subject to *de novo* review for that reason. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998).

As for the third issue, there is a question of law at issue–whether dog sniffs in general are so unreliable that they should be not allowed at all. We review this question *de novo*. *Woods*, 181 Ill. 2d at 516. In addition, we must review the trial court's factual determination that the police dog, Krott, was well trained and sufficiently reliable that his alert gave the police probable cause to search the trunk of defendant's car. "[W]hen a trial court's ruling on a motion to suppress evidence involves factual determinations and credibility assessments," the ruling will not be disturbed on appeal unless it is manifestly erroneous. *Sorenson*, 196 Ill. 2d at 431.

## History of the "Lockstep" Doctrine in Illinois

When considering the relationship, if any, between the meaning of the state constitution and the meaning of the federal constitution, there are three possible scenarios. First, a provision may be unique to the state constitution and, therefore, must be interpreted without reference to a federal counterpart. The single-subject rule of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, §8(d)) is such a provision.

Second, a provision in the state constitution may be similar to a provision in the federal constitution, but differ from it in some significant respect. The language of such a provision must be given effect. See, *e.g.*, *People v. Fitzpatrick*, 158 Ill. 2d 360, 364-65 (1994) (finding a statute unconstitutional because it infringed the guarantee of "face-to-face" confrontation then contained in article I, section 8, of the Illinois Constitution, even though the statute would have been deemed constitutional under the sixth amendment to the federal constitution). See also, *e.g.*, Wash. Const., art. I, §7 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law"); *State v. Gunwall*, 106 Wash. 2d 54, 61-63 720 P.2d 808, 812-13 (1986) (interpreting this provision to provide broader protection than the fourth amendment and thus requiring a body of state constitutional jurisprudence entirely independent of the fourth amendment).

Third, the provision in the state constitution may be identical to or synonymous with the federal constitutional provision. In the present case, we are asked to reconsider this court's long-standing position that the search and seizure clause of article I, section 6, of the Illinois Constitution of 1970 should be interpreted in the same manner as the virtually identical search and seizure clause of the fourth amendment to the United States Constitution.

The search and seizure provision of the Illinois Constitution of 1870 provided that:

> "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue without probable cause, supported by affidavit, particularly describing the

place to be searched, and the persons or things to be seized." Ill. Const. 1870, art. II, §6.

This provision, unlike the search and seizure clauses in the constitutions of some other states, did not predate the adoption of the federal constitution in 1791. See W. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501 (1977) ("[T]he drafters of the federal Bill of Rights drew upon corresponding provisions in the various state constitutions. Prior to the adoption of the federal Constitution, each of the rights eventually recognized in the federal Bill of Rights had previously been protected in one or more state constitutions"). Rather, this language was clearly modeled upon the fourth amendment to the United States Constitution, which provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

See also G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 28 (1969) (explaining that the fourth amendment to the United States Constitution is the direct and lineal ancestor of the protection afforded by the Illinois Constitution).

The phrase "supported by affidavit" in the state provision being virtually synonymous with "by Oath or affirmation" in the fourth amendment, this court repeatedly held that the two constitutions should be construed alike. See *People v. Castree*, 311 Ill. 392, 395 (1924) ("The fourth amendment to the Federal constitution is in practically the same words"); *People v. Reynolds*, 350 Ill. 11, 16 (1932) (noting that the fourth amendment was "the prototype for section 6 of article 2 of our State constitution and no reason is perceived why the latter should not receive the same interpretation as the former"); *People v. Grod*, 385 Ill. 584, 592 (1944) (the guarantees of the fourth and fifth amendments "are in effect the same as sections 6 and 10 of article II of the Illinois constitution, and are

construed alike"); *People v. Tillman*, 1 Ill. 2d 525, 529 (1953) ("while in somewhat different language," the two provisions are "in effect the same" and should be construed alike); *People v. Jackson*, 22 Ill. 2d 382, 387 (1961) (restating intention to "follow the decisions of the United States Supreme Court on identical State and Federal constitutional problems").

In 1961, the United States Supreme Court determined that the provisions of the fourth amendment applied to the states via the due process clause of the fourteenth amendment. *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961) (finding the federal exclusionary rule, based on the fourth amendment, applicable to the states via the due process clause of the fourteenth amendment). Shortly thereafter, this court stated that even before the *Mapp* decision, it "had followed the Supreme Court decisions interpreting the fourth amendment in our interpretation of section 6 of article II of the Illinois constitution," and indicated its intent to continue this practice. *People v. Williams*, 27 Ill. 2d 542, 544 (1963).

The "lockstep doctrine," as it has come to be known, thus has deep roots in Illinois and was firmly in place before the adoption of the 1970 constitution. This fact would have been known to the drafters of the Bill of Rights of the 1970 constitution, to the constitutional delegates who voted to adopt the present language, and to the voters who approved the new constitution. See *People v. Tisler*, 103 Ill. 2d 226, 241-42 (1984) (summarizing the committee report, the proceedings of the constitutional convention, and the explanation provided to voters).

When the new state constitution was adopted in 1970, article II, section 6, was replaced with the following language:

> "The people shall have the right to be secure in their persons, houses, papers, and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, §6.

This provision employs more modern usage (referring to "possessions" rather than "effects"), and a more accessible grammatical style (making "people" the subject of the sentence, rather than the "right of the people"). In addition, the provision was substantively changed by inclusion of two new clauses, each of which created a right not expressly stated in the 1870 constitution–the right to be secure against unreasonable invasions of privacy by the state and the right to be secure against unreasonable interceptions of communications by the state.

The question of whether to continue to adhere to the lockstep doctrine under the new constitution or to abandon it was first considered by this court in *People v. Rolfingsmeyer*, 101 Ill. 2d 137 (1984). At issue was whether the implied-consent statute of the Illinois Vehicle Code violated the protection against compelled self-incrimination contained in the fifth amendment to the United States Constitution and, in almost identical language, in article I, section 10, of the Illinois Constitution of 1970. This court reviewed the proceedings of the constitutional convention and found nothing to indicate an intent to provide broader protection under the state constitution and "a general recognition and acceptance of interpretations by the United States Supreme Court." *Rolfingsmeyer*, 101 Ill. 2d at 142. A member of the Bill of Rights Committee explained that the committee considered and rejected proposals to alter the language of the self-incrimination provision, but decided " 'that the existing state of the law would remain unchanged.' " *Rolfingsmeyer*, 101 Ill. 2d at 142, quoting 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1376-80 (hereinafter cited as Proceedings). The existing state of the law at that time was lockstep interpretation of identical or nearly identical language. In the end, this court held that the implied-consent statute did not violate the privilege against self-incrimination in either the federal or the state constitution. *Rolfingsmeyer*, 101 Ill. 2d at 142.

In a special concurrence, one justice stated many of the arguments made by the defendant in the present case. He noted that this court is not "bound to automatically follow the decisions of the United States Supreme Court interpreting the

comparable provision contained in the fifth amendment of the Federal Constitution." *Rolfingsmeyer*, 101 Ill. 2d at 143 (Simon, J., specially concurring). The concurring justice criticized the majority for assuming that when the same language appears in the two constitutions, it necessarily has same content unless some indication to the contrary is found in the report of proceedings of the constitutional convention: "This presumption is the reverse of the correct one and inverts the proper relationship between the State and Federal constitutions." *Rolfingsmeyer*, 101 Ill. 2d at 143 (Simon, J., specially concurring). In contrast, he asserted, there is "no evidence in the record of proceedings of the Illinois constitutional convention to indicate that the framers of article I, section 10, intended to limit the content of the self-incrimination clause to the precedents of the United States Supreme Court." *Rolfingsmeyer*, 101 Ill. 2d at 144 (Simon, J., specially concurring). Thus, he concluded, the framers of the new state constitution "did not reject further development of the law by this court or by the Supreme Court of the United States." *Rolfingsmeyer*, 101 Ill. 2d at 145 (Simon, J., specially concurring).

Later that same year, the issue surfaced again in the context of search and seizure. In *People v. Hoskins*, 101 Ill. 2d 209 (1984), this court permitted the admission of drugs into evidence after they were found in a search of the defendant's purse, which she had either thrown to the ground or dropped while fleeing from officers who were attempting to arrest her for prostitution. *Hoskins* was argued and decided as a fourth amendment question, but the court added, in *dicta*, that "[a]ny contention that section 6 of the bill of rights in our own constitution was to be interpreted differently from the Supreme Court's interpretations of the search provisions of the fourth amendment to the United States Constitution cannot be supported" because the "constitutional debates do not indicate any wish or intent to provide protections against unreasonable searches and seizures broader than those existing under decisional interpretations under the fourth amendment to the United States Constitution." *Hoskins*, 101 Ill. 2d at 218. In a dissent, the same justice wrote that "[t]he time has come for

the Illinois Supreme Court to recognize its independent obligation to interpret the bill of rights contained in the Illinois Constitution, and to make its own assessment of the appropriate balance between the privacy rights of our citizens and the legitimate requirements of law enforcement." *Hoskins*, 101 Ill. 2d at 236 (Simon, J., dissenting).

This court's decision in *People v. Tisler*, 103 Ill. 2d 226, 245 (1984), is generally considered to be the seminal case on the question of lockstep interpretation of the search and seizure provisions of the two constitutions. Before delving into the lockstep analysis in *Tisler*, however, some background is in order.

In *People v. Gates*, 85 Ill. 2d 376 (1981), *rev'd*, *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983), this court applied the two-prong test announced in *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), and explained further in *Spinelli v. United States*, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969), to determine that a warrant was not properly issued based on a tip contained in an anonymous letter that did not contain any statement showing that the author acquired the information through firsthand or personal knowledge. At the time our 1970 constitution was adopted, the *Aguilar-Spinelli* test was part of the dual state/federal jurisprudence of search and seizure that existed under our long-standing lockstep approach. When the Supreme Court decided *Gates*, however, it abandoned the *Aguilar-Spinelli* test in favor of a new totality-of-the-circumstances test. *Gates*, 462 U.S. at 238-39, 76 L. Ed. 2d at 548, 103 S. Ct. at 2332. This court subsequently applied the new, federal *Gates* test for the existence of probable cause for a warrant based on an anonymous tip, but did not expressly reject the *Aguilar-Spinelli* approach. See *People v. Exline*, 98 Ill. 2d 150 (1983) (upholding the warrant under either the *Aguilar-Spinelli* test or the *Gates* totality-of-the-circumstances test); but see *Exline*, 98 Ill. 2d at 157-58 (Goldenhersh, J., dissenting, joined by Simon, J.) (noting that this court is "not required to blindly follow the action taken by the Supreme Court in determining the standards applicable under our own

constitution," and favoring retention of the *Aguilar-Spinelli* test under the Illinois Constitution).

In *Tisler*, unlike in *Exline*, the question was squarely presented when the defendant argued, as a matter of state constitutional law, that this court should reject *Gates* and retain *Aguilar-Spinelli*. *Tisler*, 103 Ill. 2d at 241. This court looked to the drafters' choice of search and seizure language "nearly the same as that of the fourth amendment," the report of the Bill of Rights Committee, the record of proceedings, and the informational materials distributed to voters to determine that in adopting article I, section 6, the constitutional convention "manifested no intent to expand the nature of the protection afforded by the fourth amendment." *Tisler*, 103 Ill. 2d at 241-42. Thus, when this court employed the *Aguilar-Spinelli* test prior to the adoption of the 1970 constitution,

> "[W]e were not establishing the *Aguilar* test as defining the extent of the protection afforded by the Illinois Constitution. Those decisions, in effect, held that the protection against unreasonable searches under the Illinois Constitution is measured by the same standards as are used in defining the protection against unreasonable searches contained in the fourth amendment to the United States Constitution." *Tisler*, 103 Ill. 2d at 243.

Notwithstanding our continued reliance on the lockstep approach to the interpretation of the search and seizure provision of the state constitution, this court acknowledged that it was free to construe the state constitution differently from the federal constitution (*Tisler*, 103 Ill. 2d at 243), and formulated a test for determining when the state constitution need not be interpreted in lockstep with the federal constitution:

> "After having accepted the pronouncements of the Supreme Court in deciding fourth amendment cases as the appropriate construction of the search and seizure provisions of the Illinois Constitution for so many years, we should not suddenly change course and go our separate way simply to accommodate the desire of the defendant to circumvent what he perceives as a narrowing of his fourth amendment rights under the

Supreme Court's decision in *Illinois v. Gates*. Any variance between the Supreme Court's construction of the provisions of the fourth amendment in the Federal Constitution and similar provisions in the Illinois Constitution must be based on more substantial grounds. We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." *Tisler*, 103 Ill. 2d at 245.

A concurring justice noted the "developing interest in State constitutionalism" among legal scholars. *Tisler*, 103 Ill. 2d at 253 (Ward, J., concurring). Beginning with the principle that when interpreting a constitution, a court must "ascertain and give effect to the intent of the framers of it and the citizens who have adopted it" (*Tisler*, 103 Ill. 2d at 254 (Ward, J., concurring)), the concurring justice opined that:

"If these principles of constitutional construction were to be ignored critics not unreasonably would declare it judicial arrogance for courts to say that their power to construe constitutions was limited only by the restraints courts might impose upon themselves. Courts are not legislatures, and neither are they constitutional framers and adopters of constitutions. What Justice Powell said in another context is not without relevance: 'We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch.' " *Tisler*, 103 Ill. 2d at 255 (Ward, J., concurring), quoting *United States v. Richardson*, 418 U.S. 166, 188, 41 L. Ed. 2d 678, 695, 94 S. Ct. 2940, 2952 (1974) (Powell, J., concurring).

After reviewing the research papers and other materials made available to the delegates, the concurring justice concluded that they were well informed regarding their ability to expand the protections guaranteed by the federal Bill of Rights as

applied to the states through the fourteenth amendment. Based on these materials, he further concluded that the delegates made a "conscious decision" to leave the search and seizure provision unchanged but to add two new provisions dealing with privacy and eavesdropping. *Tisler*, 103 Ill. 2d at 255-58 (Ward, J., concurring).

In subsequent years, this court has often reiterated its intent to utilize the lockstep approach when construing the search and seizure clause of article I, section 6. See, *e.g.*, *People v. Mitchell*, 165 Ill. 2d 211, 217-22 (1995) (although a state is free to construe its own constitution as providing greater protection than comparable provisions in the federal constitution, the search and seizure provision of our state constitution was not intended to be broader than the search and seizure provision of the fourth amendment); *People v. Cox*, 202 Ill. 2d 462, 482 (2002) (reaffirming lockstep principle with respect to the search and seizure provision of the state constitution and the fourth amendment); *People v. Lampitok*, 207 Ill. 2d 231, 240-41 (2003) (noting this court's long-standing acknowledgment that the fourth amendment and the search and seizure provision of article I, section 6, of the Illinois Constitution provide "the same level of protection," and that unless a successful argument is made that in a particular situation the Illinois Constitution provides broader protection, Illinois courts will follow United States Supreme Court decisions on search and seizure issues).

Nevertheless, this court has, on occasion, departed from strict lockstep interpretation when circumstances warrant. In *People ex rel. Daley v. Joyce*, 126 Ill. 2d 209 (1988), the issue was the constitutionality of section 115–1 of the Code of Criminal Procedure, which provided the State with the right to a jury in certain criminal trials. Federal constitutional law permitted a statute that required government consent to a defendant's waiver of a jury trial. *Joyce*, 126 Ill. 2d at 213, citing *Singer v. United States*, 380 U.S. 24, 13 L. Ed. 2d 630, 85 S. Ct. 783 (1965) (upholding Federal Rule of Criminal Procedure 23(a)). If this court had interpreted article I, section 13, of the state constitution in lockstep with federal constitutional law, it would have upheld the constitutionality of

the statute. Instead, this court looked to the language of the state constitution, the history of the provisions dealing with the right to a jury trial, including the committee reports and debates, and the common law decisions of this court with respect to jury trials that, the debates revealed, the drafters intended to adopt as constitutional principles. Based solely upon Illinois constitutional principles, this court found section 115–1 unconstitutional and held that in a criminal prosecution, only the defendant has a right to a jury trial. *Joyce*, 126 Ill. 2d at 222.

In *People v. McCauley*, 163 Ill. 2d 414 (1994), this court considered whether a defendant's waiver of his fifth amendment right to counsel was valid where he was denied access to an attorney hired by his family, and who was present at the police station during the interrogation, trying unsuccessfully to see him. Based on the Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), this court concluded that the police conduct in denying the attorney access to his client did not violate the fifth amendment. *McCauley*, 163 Ill. 2d at 421. This court went on, however, to consider whether such conduct by police violated the due process guarantee of article I, section 2, of the state constitution. *McCauley*, 163 Ill. 2d at 425-47. After an extensive analysis of this court's previous decisions, decisions of the courts of our sister states, and, most importantly, the intent of the drafters of the 1970 constitution (*McCauley*, 163 Ill. 2d at 439-40), this court concluded that the defendant's right to due process under the state constitution was violated when he was denied the benefit of counsel during his custodial interrogation. *McCauley*, 163 Ill. 2d at 444. For example, we noted that the debates of the constitutional convention revealed an intention that the "then-existing Federal constitutional principles regarding incommunicado interrogation" remain unchanged under the new constitution. *McCauley*, 163 Ill. 2d at 439. When the Supreme Court decided *Burbine*, it diminished the protections previously provided under the fifth amendment right to counsel.

In *McCauley*, however, we did not ascribe a different interpretation to a provision of the state constitution than the

Supreme Court had ascribed to the corresponding federal constitutional provision. Rather, we determined that the police conduct at issue implicated state due process concerns. *McCauley*, therefore, does not represent a departure from lockstep interpretation of identical or nearly identical language. See *Relsolelo v. Fisk*, 198 Ill. 2d 142, 150 (2001) (distinguishing *McCauley* and holding that the self-incrimination clause of article I, section 10, of the Illinois Constitution is to be interpreted in lockstep with the fifth amendment because "the substantial grounds necessary for this court to depart from the federal interpretation of the self-incrimination clause are not present in this case").

In *People v. Washington*, 171 Ill. 2d 475 (1996), however, this court did make an exception to the lockstep doctrine. This court held, as a matter of due process under the state constitution, that a free-standing claim of innocence is cognizable in a proceeding under the state Post-Conviction Hearing Act, even though the Supreme Court decided in *Herrera v. Collins*, 506 U.S. 390, 122 L. Ed. 2d 203, 113 S. Ct. 853 (1993), that such a claim was not cognizable as a violation of due process in a federal *habeas corpus* proceeding. Several grounds for departure from the Supreme Court's ruling were mentioned: *Herrera* was "a conflicted decision"; the record of proceedings of the constitutional convention did "not reveal anything as to what the drafters intended" in this context; the *McCauley* decision demonstrated this court's willingness to look to this state's historical approach to a due process question; and refusal to consider a claim of actual innocence would be fundamentally unfair and would shock the conscience. *Washington*, 171 Ill. 2d at 485-88. A commentator characterized this court's decision in *Washington* as "implicitly eschewing lockstep." J. Reddy, *1996 Illinois Supreme Court Criminal Law Opinions: Not Marching in Lockstep*, 85 Ill. B.J. 270, 270 (1997). Indeed, the dissenting justices in *Washington* criticized the majority for reaching its decision without specifically engaging in the analysis "exemplified in *Tisler*." *Washington*, 171 Ill. 2d at 500 (Miller, J., dissenting, joined by Bilandic, C.J.).

˘16˘

This court appeared to depart from the lockstep approach in *People v. Krueger*, 175 Ill. 2d 60 (1996), by declining to follow the holding of *Illinois v. Krull*, 480 U.S. 340, 94 L. Ed. 2d 364, 107 S. Ct. 1160 (1987), which recognized a good-faith exception to the exclusionary rule when the search was authorized by a statute later determined to be unconstitutional. The threshold issue in *Krueger* was the constitutionality of a state statute permitting the issuance of a warrant authorizing "no-knock" entry into a building where the judge found that the occupant had possessed firearms within a reasonable period of time prior to the application for the warrant. *Krueger*, 175 Ill. 2d at 64. Citing *Tisler*, this court engaged in lockstep analysis of the fourth amendment and article I, section 6, of the state constitution to determine whether the statute was constitutional. *Krueger*, 175 Ill. 2d at 65-69. Finding the statute unconstitutional under fourth amendment principles, the next question was whether the evidence seized during the search should be suppressed. This court concluded that the "*Krull* good-faith exception does not comport with article I, section 6, of the Illinois Constitution of 1970." *Krueger*, 175 Ill. 2d at 70. Noting this state's history of applying the exclusionary rule under the state constitution as well as a long-standing tradition of barring evidence gathered under the authority of an unconstitutional statute, this court rejected the *Krull* good-faith rule as creating a "grace period for unconstitutional search and seizure legislation," during which constitutional rights of Illinois citizens could be violated with impunity. *Krueger*, 175 Ill. 2d at 75. Thus, this court "knowingly depart[ed]" from the lockstep tradition to give effect to another tradition–the exclusion of evidence gathered in violation of the state constitution's prohibition of unreasonable searches and seizures. *Krueger*, 175 Ill. 2d at 74, citing *People v. Brocamp*, 307 Ill. 448 (1923) (noting the Supreme Court's adoption of a federal exclusionary rule in *Weeks v. United States*, 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1914), and adopting a similar rule under the state constitution).

The same commentator noted that:

> "[I]n both *Washington* and *Krueger*, the court found broader protections for Illinois citizens than those

afforded under recent U.S. Supreme Court decisions without any showing of a difference in the language of the constitutional provisions being construed and without any reference to the debates of the Illinois Constitutional Convention." 85 Ill. B.J. at 271.

He further opined that this court had "clearly moved from lockstep application to mere deference. That is, the court will continue to apply U.S. Supreme Court precedent when it is persuasive." 85 Ill. B.J. at 271.

We rejected that reading, however, in *People v. Bolden*, 197 Ill. 2d 166, 179-80 (2001), in which we explained that:

> "We do not construe *Krueger* as suggesting that the search and seizure clause of article I, section 6, of the Illinois Constitution must be interpreted more expansively than the corresponding right found in the fourth amendment. The exclusionary rule is a judicially created remedy, and its history in Illinois may be traced to this court's decision in *People v. Brocamp*, 307 Ill. 448 (1923)."

Thus, in *Krueger*, we did not depart from lockstep interpretation–the challenged statute was unconstitutional under both the state and federal constitutions. *Krueger* was a case about remedies. We construed state law as providing a remedy for the constitutional violation even though the federal constitution did not require one.

Against the backdrop of this court's decades-long history of lockstep interpretation of cognate provisions of the state and federal constitutions, as well as the making of occasional exceptions to the lockstep doctrine, we now turn to defendant's argument that we should abandon lockstep entirely and set about developing an independent body of state constitutional law.

Continued Adherence to Illinois' Limited Lockstep Doctrine

Defendant asserts that the lockstep doctrine has been adopted by this court as a "governing rule," rather than a "discretionary practice." He argues for abandonment of this approach and states that it is "vital as a matter of state

sovereignty and federalism" that this court independently examine constitutional issues under the state constitution rather than consider itself bound by the interpretation of the cognate provisions of the United States Constitution by the United States Supreme Court. Doing otherwise, he claims, is an abandonment by this court of its duty and a forfeiture of the sovereignty of the State of Illinois. With specific reference to his own claim, defendant notes that our use of the lockstep approach results in the Supreme Court's being able to review "pro-defense decisions" of this court, such as those reversing a conviction or affirming the suppression of evidence. He argues that this is unfair to defendants who have obtained a favorable ruling from an Illinois court when that decision is subsequently reversed by the Supreme Court. Our lockstep approach, according to defendant, permits "a state court to avoid accountability by hiding behind federal law" and "diminishes the experimental function that federalism allows."

*Amicus* ISBA also urges this court to reject the lockstep doctrine and to develop an independent body of law interpreting article I, section 6, of the Illinois Constitution. *Amicus* ACLU maintains that this court's lockstep approach violates the judicial oath and does violence to the principle that it is this court's nondelegable duty to construe and interpret the Illinois Constitution. The ACLU states that:

> "By 'harnessing' its interpretation of the Illinois Constitution to the United States Supreme Court's jurisprudence, this Court would improperly abdicate its non-delegable constitutional duty to 'say what the law is.' In doing so, this Court would undermine the sovereignty and independence of the State of Illinois, and degrade both this Court and the rights of Illinois citizens."

Further, with respect to the particular facts of this case, the ACLU asserts:

> "A suspicionless canine sniff undeniably alters the scope of a traffic stop, as this investigative technique categorically transforms traffic stops into criminal investigations. Furthermore, the presence of a drug-sniffing dog fundamentally changes the traffic stop from

a minor, unintrusive interaction with law enforcement into an intrusive, humiliating, and often intimidating encounter. It is also a practice that facilitates racial profiling."

The ACLU concludes that this court should interpret article I, section 6, of the Illinois Constitution to be more protective of individual rights than the fourth amendment requires.

In response, the State points out that nothing in the text or history of the search and seizure clause of article I, section 6, suggests an intent that it be interpreted differently from the fourth amendment, at least in the context of traffic stops or the use of trained canines by the police. The State also argues that the doctrine of *stare decisis* weighs heavily in favor of not overruling *Tisler*, *Mitchell*, *Bolden*, and their progeny.

In 1977, just seven years after Illinois adopted its present constitution, an influential article by Justice William J. Brennan, Jr., appeared in the Harvard Law Review. See 90 Harv. L. Rev. 489. Justice Brennan urged state courts to view their state constitutions as "a font of individual liberties," that is, as a source of positive rights and liberties entitled to protection beyond that required by the United States Supreme Court's interpretation of the federal constitution. 90 Harv. L. Rev. at 491. He criticized a trend in decisions of the Court that, in his opinion, pulled back from earlier, more protective rulings. 90 Harv. L. Rev. at 495 & nn.47-51 (and cases cited).

Justice Brennan further noted, at least with respect to state constitutions predating the drafting of the Bill of Rights, that these state constitutions were not adopted "to mirror the federal Bill of Rights." Rather, he observed that "prior to the adoption of the fourteenth amendment [in 1868], these state bills of rights, independently interpreted, were the primary restraints on state action since the federal Bill of Rights had been held inapplicable." 90 Harv. L. Rev. at 501-02.

In Justice Brennan's view, many "door-closing decisions" had unfortunately been rendered by the Court in the name of federalism. The Court, he said, had "condoned both isolated and systematic violations of civil liberties." 90 Harv. L. Rev. at 502. Justice Brennan concluded by urging state courts to "step

into the breach" and to give effect to state constitutions that provide "a double source of protection for the rights of our citizens." 90 Harv. L. Rev. at 503.

Thus began the scholarly debate regarding the relationship between cognate provisions of the state and federal constitutions. The approach urged by Justice Brennan was criticized as "programmatic" and "result-oriented." L. Friedman, *The Constitutional Value of Dialogue and the New Judicial Federalism*, 28 Hastings Const. L.Q. 93, 94 (2000). It was suggested that Justice Brennan's encouragement of the rise of state constitutionalism was merely a response to the changing make-up of the Court. See 28 Hastings Const. L.Q. at 94 n.3. See also W. Brennan, *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L. Rev. 535, 547-48 (1986) (noting "an unmistakable trend in the Court to read the guarantees of individual liberty restrictively, which means that the content of the rights applied to the states is likewise diminished"; and that "the Court's contraction of federal rights and remedies on grounds of federalism should be interpreted as a plain invitation to state courts to step into the breach").

Other authors and some state supreme courts embraced Brennan's call for a "new judicial federalism." See 28 Hastings Const. L.Q. at 94 nn.4, 5. In this view, courts that find it unnecessary to distinguish between state and federal constitutional provisions when they use the same language "reduce[ ] state constitutional law to a redundancy and greatly discourage[ ] its use and development." J. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 761, 804 (1992). Defendant bases his argument, in large part, on T. McAffee, *The Illinois Bill of Rights And Our Independent Legal Tradition: A Critique Of The Illinois Lockstep Doctrine*, 12 S.I.U. L.J. 1, 87 (1987) (urging the Illinois Supreme Court to abandon lockstep analysis of constitutional issues because lockstep "limit[s] the judicial role in giving effect to the promise held out" by the guarantees of the state constitution).

Both before and since Justice Brennan's call to action, state courts have adopted various methods for construing cognate provisions of the state and federal constitutions. One method is

the lockstep approach, by which the state court binds itself to following prior Supreme Court interpretation of the federal constitutional text.

"Under the lockstep approach, the state constitutional analysis begins and ends with consideration of the U.S. Supreme Court's interpretation of the textual provision at issue. On this approach, federal rulings are regarded as having attained 'a presumption of correctness' from which the state should be loathe to part. In other words, congruence with federal decisional law is assumed to be the norm, and deviation is for all intents and purposes impossible. Such an approach is justified, at least in regard to the enforcement of the criminal law, by an interest in uniformity, which urges the development of identical state and federal rules to control government conduct in regard to procedural issues." 28 Hastings Const. L.Q. at 102-03.

A second approach is based on the application of criteria by the state court to determine whether factors unique to the state weigh in favor of departing from the Supreme Court's interpretation of the same constitutional language. This has been referred to the "interstitial approach." 90 Mich. L. Rev. at 774.

"Under the interstitial approach, the court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined. [Citation.] A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *State v. Gomez*, 122 N.M. 777, 783, 932 P.2d 1, 7 (1997).

Other sources describe the interstitial approach as a state court's turning to the state constitution for guidance only "if federal constitutional law approves the challenged state action, or is ambiguous." 90 Mich. L. Rev. at 774-75. Under either of these formulations of the interstitial approach, the focus of

constitutional inquiry is on "the ways in which the state and federal constitutions differ." Federal constitutional decisions are the starting point, and the party urging greater protection than federal law affords must argue that the state and federal constitutions "differ in dispositive ways." 90 Mich. L. Rev. at 777-78.

A third approach, that urged by defendant and his *amici*, is the primacy or primary approach, under which "the state court undertakes an independent [state] constitutional analysis, using all the tools appropriate to the task, and relying upon federal decisional law only for guidance." 28 Hastings Const. L.Q. at 95.

When a state court employs the interstitial approach or the primacy approach, it can insulate its decision from Supreme Court review by stating "clearly and expressly that it is alternatively based on bona fide, separate, adequate, and independent [state] grounds." *Michigan v. Long*, 463 U.S.1032, 1041, 77 L. Ed. 2d 1201, 1214, 103 S. Ct. 3469, 3476 (1983).

This court's approach to analysis of cognate provisions in the Illinois and United States Constitutions has been described as "lockstep." Indeed, this court itself has employed this term. However, on further consideration, it is clear that it is an overstatement to describe our approach as being in strict lockstep with the Supreme Court. The approach that this court has taken is more properly described as either an interstitial or perhaps a limited lockstep approach. While we have not unequivocally adopted the interstitial approach as it has been broadly defined by the New Mexico court (*Gomez*, 122 N.M. at 783, 932 P.2d at 7), we have, at the very least, embraced a narrow version of the interstitial approach, under which we recognize several justifications for departing from strict lockstep analysis. This approach has been described as one under which a court will " 'assume the dominance of federal law and focus directly on the gap-filling potential' " of the state constitution. 28 Hastings Const. L.Q. at 104, quoting *Developments in the Law–The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1357 (1982). Under this approach, this court will "look first to the federal constitution, and only if federal law provides no relief turn to the

state constitution to determine whether a specific criterion–for example, unique state history or state experience–justifies departure from federal precedent." 28 Hastings Const. L.Q. at 104. To avoid confusing this court's approach with the very broad definition of the interstitial approach adopted by some courts, we shall refer to it, for lack of a better term, as our "limited lockstep approach."

States applying the interstitial or criteria approach have adopted various criteria. New Jersey courts, for example, will look to the textual language (whether there is any significant difference between the phrasing of the state and federal provisions), the legislative history of the state constitutional provision, preexisting state law, state traditions, and public attitudes. See *State v. Hunt*, 91 N.J. 338, 363-68, 450 A.2d 952, 965-67 (1982) (concluding that with respect to telephone billing records, the state constitution did provide greater privacy rights than the federal constitution).

The criteria adopted by this court in *Tisler* are somewhat more limited:

> "We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." *Tisler*, 103 Ill. 2d at 245.

See also 28 Hastings Const. L.Q. at 105 (noting that the criteria used to decide when a departure from lockstep is justified "need not be uniform from jurisdiction to jurisdiction," and using the criteria formulated in *Tisler* and cited in *DiGuida* as an example), citing *People v. DiGuida*, 152 Ill. 2d 104 (1992).

In *Krueger*, without expressly stating that we were adopting additional criteria, we nevertheless found that state tradition and preexisting state law, as set out in *Brocamp*, necessitated the application of the state exclusionary rule, even though no remedy for the underlying constitutional violation was required under the fourth amendment. Similarly, in *Washington*, we

looked to our state's traditions and values to determine that denial of a new trial on the basis of evidence of actual innocence would be fundamentally unfair and would shock the conscience. *Washington*, 171 Ill. 2d at 487-88.

Defendant calls our attention to decisions of the high courts of several of our sister states, in which the strict lockstep doctrine has been rejected. In *State v. Russell*, 477 N.W.2d 886, 889 n.3 (Minn. 1991), the Minnesota Supreme Court employed a more stringent standard of review than mere rational basis in its equal protection analysis under the state constitution, although the "state constitution embodies principles of equal protection synonymous to the equal protection clause of the Fourteenth Amendment."

In *State v. Sullivan*, 348 Ark. 647, 649-52, 74 S.W.3d 215, 217-18 (2002), Arkansas' highest court declined to follow the decision of the United States Supreme Court in *Whren v. United States*, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996), and held, as a matter of state constitutional law, that a pretexual arrest is unreasonable police conduct warranting application of the exclusionary rule. The Arkansas court noted that the wording of the state search and seizure provision and the fourth amendment's search and seizure provision are "virtually identical" and that in some contexts, it had interpreted the words in lockstep. *Sullivan*, 348 Ark. at 650-51, 74 S.W.3d at 217-18. However, the court noted that in other contexts it would "provide more protection under the Arkansas Constitution than that provided by the federal courts." *Sullivan*, 348 Ark. at 652, 74 S.W.3d at 218. The "pivotal inquiry in this regard" was "whether this court has traditionally viewed an issue differently than the federal courts." Because the Arkansas court had "considered pretextual arrests to be unreasonable for over twenty years," the remedy of application of the exclusionary rule was proper. *Sullivan*, 348 Ark. at 652, 74 S.W.3d at 218-19. We note that this result is not unlike this court's decision in *Krueger*, in which a long-standing state tradition mandated application of the exclusionary rule.

Finally, in *State v. Gomez*, 122 N.M. 777, 932 P.2d 1 (1997), the issue was whether a warrantless search of a parked car and its contents, performed after the arrest of the

car's owner, required a particularized showing of exigent circumstances to be permissible under the state constitution. *Gomez*, 122 N.M. at 780-81, 932 P.2d at 4-5. The Supreme Court of New Mexico rejected the primacy approach and specifically adopted the interstitial approach to state constitutional interpretation because:

> " '[w]hen federal protections are extensive and well-articulated, state court decisionmaking that eschews consideration of, or reliance on, federal doctrine not only will often be an inefficient route to an inevitable result, but also will lack the cogency that a reasoned reaction to the federal view could provide, particularly when parallel federal issues have been exhaustively discussed by the United States Supreme Court and commentators.' " *Gomez*, 122 N.M. at 783, 932 P.2d at 7, quoting 95 Harv. L. Rev. at 1357.

The New Mexico court found that the interstitial approach effectively advanced the goal of preserving national uniformity in the development and application of the fundamental rights guaranteed by both the state and federal constitutions. *Gomez*, 122 N.M. at 784, 932 P.2d at 8.

In sum, on the basis of the scholarly literature, the practices of other states, and public policy, defendant and his *amici* argue for abandonment of the limited lockstep approach taken by this court in the past and for adoption of the primacy approach, under which this court would begin to write on an essentially blank slate a jurisprudence of state constitutional law without regard to federal decisional law except, perhaps, as persuasive authority. See 28 Hastings Const. L.Q. at 106-08 (describing the process of primary state constitutional analysis).

This argument implicates the principle of *stare decisis*, which "expresses the policy of the courts to stand by precedents and not to disturb settled points." *Neff v. George*, 364 Ill. 306, 308-09 (1936). Thus, we have expressed our agreement with the United States Supreme Court's pronouncements on this matter: " 'Adhering to precedent "is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be

˘26˘

settled right." [Citation.]' " *People v. Jones*, 207 Ill. 2d 122, 134 (2003), quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 115 L. Ed. 2d 720, 737, 111 S. Ct. 2597, 2609 (1991), quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 76 L. Ed. 815, 823, 52 S. Ct. 443, 447 (1932).

In the end, we reaffirm our commitment to limited lockstep analysis not only because we feel constrained to do so by the doctrine of *stare decisis*, but because the limited lockstep approach continues to reflect our understanding of the intent of the framers of the Illinois Constitution of 1970. This court's jurisprudence of state constitutional law cannot be predicated on trends in legal scholarship, the actions of our sister states, a desire to bring about a change in the law, or a sense of deference to the nation's highest court. See *Tisler*, 103 Ill. 2d at 255 (Ward, J., concurring) (noting that if the court were to stray from established principles of constitutional construction "critics not unreasonably would declare it judicial arrogance for courts to say that their power to construe constitutions was limited only by the restraints courts might impose upon themselves"). This court's jurisprudence of state constitutional law is not affected by trends in legal scholarship; it is not governed by the actions of our sister states; it is not influenced by a desire to bring about change in the law or by a sense of deference to the nation's highest court. Rather, our choice of a rule of decision on matters governed by both the state and federal constitutions has always been and must continue to be predicated on our best assessment of the intent of the drafters, the delegates, and the voters–this is our solemn obligation.

In keeping with this obligation, and based on its understanding of the intent of the drafters, this court adopted a limited lockstep approach in *Tisler* and modified it in *Krueger* and *Washington* to allow consideration of state tradition and values as reflected by long-standing state case precedent. This limited lockstep approach is not a surrender of state sovereignty or an abandonment of the judicial function. It is, instead, based on the premise that the drafters of the 1970 constitution and the delegates to the constitutional convention intended the phrase "search and seizure" in the state

document to mean, in general, what the same phrase means in the federal constitution.

### Application of the Limited Lockstep Doctrine

Defendant argues that, notwithstanding the United States Supreme Court's interpretation of the search and seizure clause of the fourth amendment, this court should consider a canine sniff to be a "search," within the meaning of article I, section 6. He observes, correctly, that state courts are free to independently construe their state constitutions to provide more protection than the federal constitution. He offers decisions from the courts of our sister states that have imposed a requirement of reasonable, articulable suspicion of criminal activity before a dog sniff may be conducted.

In *State v. Carter*, 697 N.W.2d 199, 210 (Minn. 2005), the Supreme Court of Minnesota held that a dog sniff of a self-storage unit was a search within the meaning of the article I, section 10, of the Minnesota Constitution. This provision is virtually identical to the fourth amendment (see Minn. Const., art. 1, §10), but under Minnesota law, decisions of the United States Supreme Court interpreting the language are merely persuasive, not authoritative. *Carter*, 697 N.W.2d at 210.

The Supreme Court of Pennsylvania ruled in *Commonwealth v. Johnston*, 515 Pa. 454, 466, 530 A.2d 74, 79 (1987), that although a dog sniff of the outside of a storage locker was not a search for fourth amendment purposes, it nevertheless violates state law unless the police are "able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test," and "the police are lawfully present in the place where the canine sniff is conducted." Under this holding, the police are not permitted to use a narcotics-detection dog or "any other crime detection device, at random and without reason." *Johnston*, 515 Pa. at 465, 530 A.2d at 79. The wording of article I, section 8, of the Pennsylvania Constitution is also almost identical to that of the fourth amendment. See Pa. Const., art. 1, §8.

Finally, defendant cites *McGahan v. State*, 807 P.2d 506 (Alaska App. 1991), another case in which a state court held

that its state constitution requires police officers to have reasonable suspicion before conducting a warrantless canine sniff of the exterior of a warehouse. A previous appellate court decision in that state had held that a canine sniff of luggage was a search under the Alaska Constitution. *McGahan*, 807 P.2d at 509, citing *Pooley v. State*, 705 P.2d 1293, 1311 (Alaska App. 1985). Again, the language of article 1, section 14 of the Alaska Constitution tracks the language of the fourth amendment. See Alaska Const., art. 1, §14.

In each of these cases, a state court construed a state constitutional provision that does not differ in any significant respect from the fourth amendment to reach the result urged by defendant. However, in light of our continued adherence to the lockstep doctrine, albeit with some room for flexibility, these cases do not persuade us to construe the search and seizure clause of our constitution any more broadly than the search and seizure clause of the fourth amendment.

We further conclude that defendant has not made a case for an exception to the lockstep doctrine. Nothing in the language of article I, section 6, or in the history of the constitutional debates suggests an intent that the use of trained dogs by the police be considered an unreasonable search or seizure. Indeed, the drafters were no doubt aware of a long history of police use of trained dogs for a variety of purposes, from search and rescue to the tracking of both lost children and fleeing felons.

Despite defendant's arguments that the people of the State of Illinois will be best served by an expansive reading of the search and seizure clause of our constitution and by insulating "pro-defense" decisions from further review and possible reversal, we note that the people of this state have a stake in both sides of this debate. Indeed, this prosecution was brought in the name of the People of the State of Illinois, who are well served when law enforcement officers are able to detect the presence of illegal narcotics and to arrest those who violate the law. The people are also well served when law enforcement officers and other state actors are constrained from intruding upon the privacy of individuals.

We conclude that the search and seizure clause of article I, section 6, of the state constitution, as construed under our limited lockstep approach, strikes the proper balance between protecting the people from unreasonable intrusion by the state and providing the people with effective law enforcement. We will not depart from the intent of the framers of the Illinois Constitution of 1970 or the understanding of voters who adopted it–to the extent we are able to discern it from the language used, the committee comments, and the debate–to tip the balance in favor of expanding the scope of the right to be free from unreasonable searches and seizures that is already guaranteed by the fourth amendment. The expansion of the protections guaranteed by the state constitution can be brought about by amending the constitution or by the enactment of statutes by the General Assembly. Such expansion of rights, however, is not the function of this court.

We comment, briefly, on the assertions made by defendant and his *amici* regarding the potential for abuse and racial profiling in the use of police dogs. These concerns, while weighty, are not at issue here. Further, such problems, where they exist, are not to be remedied by finding the reasonable use of canines for the purpose of detection of contraband unconstitutional under the search and seizure clause.

Dog Sniffs as a Violation of the Privacy Clause

Article I, section 6, of the Illinois Constitution of 1970, in addition to prohibiting unreasonable searches and seizures, prohibits "unreasonable *** invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I, §6. The additional language "expands upon the individual rights which were contained in Section 6 of Article II of the 1870 Constitution and the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution." ILCS Ann., Ill. Const. 1970, art. I, §6, Constitutional Commentary, at 522 (Smith-Hurd 1993). Further, the protection against unreasonable invasions of privacy "is stated broadly," and "[n]o definition of types of privacy" intended to be protected "is offered." ILCS Ann., Ill. Const. 1970, art. I, §6, Constitutional Commentary, at 522 (Smith-Hurd

1993). This language was recommended to the Constitutional Committee by the Bill of Rights Committee, accompanied by a committee report stating:

> "It is doubtless inevitable that any person who chooses to enjoy the benefits of living in an organized society cannot also claim the privacy he would enjoy if he were to live away from the institutions of government and the multitudes of his fellow men. It is probably also inevitable that infringements on individual privacy will increase as our society becomes more complex, as government institutions are expected to assume larger responsibilities, and as technological developments offer additional or more effective means by which privacy can be invaded. In the face of these conditions, the Committee concluded that it was essential to the dignity and well being of the individual that every person be guaranteed a zone of privacy in which his thoughts and highly personal behavior were not subject to disclosure or review. The new provision creates a direct right to freedom from such invasions of privacy by government or public officials."

The search and seizure provision of article I, section 6, was intended to add "nothing new or no new concepts." 3 Proceedings 1523 (comment of Committee Member Dvorak). The clause creating an additional right to privacy, however, was added to article I, section 6, in response to a concern that the government might use newly available technology to develop "a general information bank" that would collect and monitor personal information. 3 Proceedings 1525. In response to a delegate's question about the sorts of invasions of privacy that would fall within the scope of the privacy clause, a committee member gave the example of a governmental employer creating a peephole into a women's washroom to observe an employee suspected of theft. "This could be considered an invasion of one's privacy." 3 Proceedings 1530.

The delegates considered an amendment from the floor that would have stricken the privacy clause from article I, section 6. During the debate on this amendment, the chairman of the Bill of Rights Committee commented:

"We recognize in our report that in this kind of crowded, complicated world that there are necessarily a lot of invasions of privacy–that some of those invasions are reasonable. All we are saying, without spelling out in detail, is that a halt ought to be called somewhere to these invasions of privacy. The individual ought not to be completely at the mercy of the state. *** And the purpose obviously of this provision is to cover those situations that *aren't covered by the other parts* of the proposed section 6." (Emphasis added.) 3 Proceedings 1535 (comment of Chairman Gertz).

The chairman offered the example of devices that could "penetrate walls and can view what's going on" inside a person's home, revealing "bedtime intimacies and private conversations," as the kind of unreasonable invasion of privacy that should be prohibited. 3 Proceedings 1535. The amendment failed and the privacy clause became a part of our state constitution.

Defendant argues that a canine sniff invades the zone of privacy guaranteed by the privacy clause of article I, section 6, and offends the dignity and well-being of the subject of the sniff. Thus, he argues that the privacy clause should be interpreted by this court to require the existence of "specific and articulable facts" suggesting drug activity before a canine sniff can be conducted during a routine traffic stop. Defendant asserts that this court's reasoning in *Caballes I* was correct, erring only in that it was based on a fourth amendment analysis rather than on an analysis of article I, section 6. Specifically, he argues that the constitutional commentary indicates the drafters' intent to create a zone of personal privacy free from disclosure or review and that a canine sniff subjects a citizen's behavior to disclosure and review, in violation of the clause. He does not, however, describe how an individual's private behavior is revealed when his vehicle is circled by a police officer and a trained narcotics-detection dog. He further asserts that a canine search during at traffic stop "casts a pall of suspicion over innocent people."

*Amicus* ISBA suggests that the transcript of the proceedings of the constitutional convention reveals the

drafters' intent to provide greater protections under the privacy clause than are guaranteed under the search and seizure clauses of the state and federal constitutions. *Amicus* ACLU claims that this court "has consistently applied the Privacy Clause to more sophisticated techniques that allow the State to gather and analyze data not available by employing ordinary unenhanced human sensory capacities." *Amicus* ACLU states that this court has "created a false dichotomy between search and seizure claims and privacy claims," which is "is unnecessary and too broad." The ACLU also contends that this dichotomy makes the privacy clause "a meaningless nullity in all criminal contexts," because this court analyzes any investigative device or technique that invades privacy interests under the search and seizure clause rather than under the privacy clause.

The State responds that the privacy clause is not implicated in the present case because this court's previous decisions dictate that the police conduct at issue should be analyzed only under the search and seizure clause. Further, the State argues that if this court were to apply the privacy clause in the context of a traffic stop, defendant had no reasonable expectation of privacy in odors emanating from his vehicle, even if those odors were not detectable by an officer without the assistance of a trained dog.

Our analysis must begin with this court's decision in *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381 (1992). At issue in *Will County Grand Jury* were grand jury subpoenas ordering two individuals, against whom no charges had been filed, to appear in a lineup and to submit fingerprints, palm prints, and samples of blood, head hair, and pubic hair. *Will County Grand Jury*, 152 Ill. 2d at 385. This court noted that "[e]ven before the adoption of the 1970 Constitution," its decisions had provided protection for individual privacy rights in books and records. *Will County Grand Jury*, 152 Ill. 2d at 391. Just as a person has a reasonable expectation that his private records will not be exposed to public view, he has a similarly reasonable expectation "that he will not be forced to submit to a close scrutiny of his personal characteristics, unless for a valid reason." *Will County Grand Jury*, 152 Ill. 2d at 391-92.

This court concluded, therefore, that a grand jury's ability to gather such evidence implicated not only the fourth amendment but also the privacy clause of article I, section 6, of the state constitution. *Will County Grand Jury*, 152 Ill. 2d at 389-91.

Once the right to privacy under article I, section 6, is established, the court must determine whether the state's invasion of individual privacy is reasonable. In the context of a grand jury investigation, reasonableness is determined by balancing "the interest of the individual in maintaining his privacy against the interest of the public in preserving the effectiveness of the grand jury." *Will County Grand Jury*, 152 Ill. 2d at 392. Under this analysis, a grand jury may not subpoena documents unless they are relevant to the investigation. *Will County Grand Jury*, 152 Ill. 2d at 393. A grand jury seeking physical evidence of a noninvasive nature, such as requiring an individual to appear in a lineup or to submit to fingerprinting, must make "some showing of individualized suspicion as well as relevance." *Will County Grand Jury*, 152 Ill. 2d at 393. The taking of hair samples, however, deserves greater scrutiny. The taking of hair samples from an individual's head "is more of an intrusion into individual privacy than is the direction to appear in a lineup or to provide fingerprints." *Will County Grand Jury*, 152 Ill. 2d at 399. Although head hair is a physical characteristic observable by the public, an individual "does not ordinarily have the expectation that others will cut, pull or comb his hair without his permission, and thus he has a greater expectation of privacy in keeping his hair intact than he does in simply having it observed." *Will County Grand Jury*, 152 Ill. 2d at 399. The taking of hair samples "diminishes the body" of the individual, "albeit to a small degree." *Will County Grand Jury*, 152 Ill. 2d at 399. Thus, a subpoena for the production of samples of head hair "unsupported by probable cause, is an unreasonable violation of the right to privacy protected by the Illinois Constitution." *Will County Grand Jury*, 152 Ill. 2d at 399. With regard to samples of pubic hair, the violation of the right to privacy is even more clear. The pubic area "is normally hidden from the view of others," and the "demand for pubic hair

represents a considerable intrusion into personal privacy," which must be justified by a showing of probable cause. *Will County Grand Jury*, 152 Ill. 2d at 395. Our decision in *Will County Grand Jury* thus established a continuum of privacy protections–from mere relevance, to relevance plus individualized suspicion, to probable cause–depending on the degree of intrusiveness of the grand jury's inquiry.

In the wake of *Will County Grand Jury*, the privacy clause of article I, section 6, has been invoked in various contexts. In one group of cases, this court has applied the two-part analysis of *Will County Grand Jury* to determine whether the privacy clause is implicated in the particular context of the claim and, then, if necessary, gone on to consider the reasonableness of the invasion. The two contexts in which this analysis has been undertaken have involved either the State's effort to obtain access to personal documents and records or the information contained therein or to engage in "close scrutiny of [the] personal characteristics" of an individual. As we noted in *Will County Grand Jury*, "the individual's privacy interest in his physical person, as well as his privacy interest in his documents, must be protected." *Will County Grand Jury*, 152 Ill. 2d at 391-92.

In the other group of cases, although a party argued that the privacy clause was implicated, this court determined that the situation should instead be examined entirely under traditional search and seizure principles. These cases have not involved either the exposure of personal information or close scrutiny of personal characteristics. These are the cases that *amicus* ACLU describes as having created "a false dichotomy between search and seizure claims and privacy claims."

The first group of cases includes *King v. Ryan*, 153 Ill. 2d 449 (1992), *Fink v. Ryan*, 174 Ill. 2d 302 (1996), *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997), *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21 (2001), and *People v. Cornelius*, 213 Ill. 2d 178 (2004).

In *King*, this court declared unconstitutional a statute authorizing the chemical testing of the blood, breath, or urine of an individual who had been in control of a vehicle involved in

an accident causing personal injury or death. The flawed statute required only probable cause to believe that the driver had been at fault, in whole or in part, for the accident. There was no requirement that there be even the slightest indication the driver was intoxicated. Refusal to submit to the test resulted in suspension of the individual's driver's license. *King*, 153 Ill. 2d at 455-56. This court concluded that the statute violated the fourth amendment because it failed to require probable cause of intoxication before the police could gather such evidence for use in a possible criminal proceeding. *King*, 153 Ill. 2d at 458-64. This court then considered the plaintiff's additional argument that the statute violated the privacy clause of article I, section 6, of the Illinois Constitution of 1970. Referring to our decision in *Will County Grand Jury*, this court stated that "requiring a urine sample is more intrusive than cutting a person's hair" and "a chemical analysis of an individual's breath is at least as intrusive as requiring a hair sample for testing." *King*, 153 Ill. 2d at 464. It followed, therefore, that the chemical tests the statute purported to authorize could not be conducted absent probable cause to believe the individual had committed a crime. *King*, 153 Ill. 2d at 464-65.

Subsequently, the legislature enacted a modified version of the invalidated statute, authorizing the testing of blood, breath, or urine of the driver of a vehicle involved in a personal injury or fatal accident, but only if the individual is arrested. In *Fink*, this court determined that the successor statute passed constitutional muster under both the fourth amendment and the state constitution. Under the successor statute, no driver can be chemically tested unless he has been arrested, based on probable cause, for a nonequipment violation of the Vehicle Code. *Fink*, 174 Ill. 2d at 315. With respect to the privacy clause of article I, section 6, this court concluded that, as a result, the "driver's zone of privacy is not unconstitutionally invaded" when he is chemically tested pursuant to the statute. *Fink*, 174 Ill. 2d at 315.

In *Kunkel*, this court considered the constitutionality of section 2–1003(a) of the Code of Civil Procedure (735 ILCS 5/2–1003(a) (West 1994)), which had been amended as part of

the Civil Justice Reform Amendments of 1995 (Pub. Act 89–7, eff. March 9, 1995). After concluding that amended section 2–1003(a) violated the separation of powers clause of article II, section 1, of the Illinois Constitution of 1970 (*Kunkel*, 179 Ill. 2d at 536-37), this court went on to consider an alternate basis for declaring the amended statute unconstitutional–that it violated "the right to privacy expressly set forth in our state constitution." *Kunkel*, 179 Ill. 2d at 537. The privacy clause of article I, section 6, was implicated because the amended statute provided that any party alleging bodily injury or disease was deemed to waive any privilege of confidentiality with his or her health-care providers. The amended statute further provided that upon the request of any party, the party claiming such injury or disease shall sign and deliver consent forms authorizing his or her health-care providers to disclose medical records to the requesting party and to engage in *ex parte* conferences with the requesting party's attorney. *Kunkel*, 179 Ill. 2d at 524-25. This court noted that the "confidentiality of personal medical information is, without question, at the core of what society regards as a fundamental component of individual privacy." *Kunkel*, 179 Ill. 2d at 537. Indeed, such information is generally contained in the very type of personal record or document that this court protected even prior to the enactment of the 1970 constitution. See *Will County Grand Jury*, 152 Ill. 2d at 391. Such information is no less deserving of protection merely because it may be obtained directly from a health-care provider rather than from confidential medical records.

Citing the earlier decision in *Will County Grand Jury*, this court stated that article I, section 6, forbids unreasonable invasions of privacy and that, "[i]n the context of civil discovery, reasonableness is a function of relevance." *Kunkel*, 179 Ill. 2d at 538. Amended section 2–1003(a) was held unconstitutional because it permitted "disclosure of highly personal medical information having no bearing on the issues in the lawsuit" and, as such, permitted "a substantial and unjustified invasion of privacy." *Kunkel*, 179 Ill. 2d at 539. See also *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997) (declaring the Civil Justice Reform Amendments of 1995 unconstitutional *in toto*; noting that the right to be free from unreasonable governmental

intrusions upon privacy of article I, section 6, is supplemented by the constitutional right to a certain remedy for invasions of privacy in article I, section 12, of the Illinois Constitution of 1970).

Several years thereafter, the plaintiff in a medical malpractice action challenged the constitutionality of portions of the Hospital Licensing Act (210 ILCS 85/1 *et seq.* (West 2000)) on separation of powers, privacy, and special legislation grounds. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21 (2001). The challenged provisions permit medical staff members to communicate with a hospital's legal staff regarding the care of a patient who files a malpractice action, even if the staff member is not a party to the action. In addition, the statute provides that hospital medical personnel who act in good faith in providing information about a patient's care to hospital legal staff are protected from civil or criminal liability. 210 ILCS 85/6.17(d), (e) (West 2000). We rejected the plaintiff's contention that these provisions violate the patient's right to privacy under article I, sections 6 and 12, and under this court's decisions in *Kunkel* and *Best*. Although the privacy clause is most certainly implicated by these provisions in the Hospital Licensing Act, only unreasonable invasions of privacy are constitutionally forbidden. *Burger*, 198 Ill. 2d at 52. We concluded that the "limited intrahospital communications allowed pursuant to subsections (d) and (e) in order to assure quality patient care do not unreasonably invade a hospital patient's expectation of privacy."

This court first addressed a privacy claim based on article I, section 6, in the context of a criminal prosecution in *People v. Cornelius*, 213 Ill. 2d 178 (2004). The defendant, who was charged with failure to register as a sex offender, challenged the constitutionality of the Sex Offender Registration Act (730 ILCS 150/1 *et seq.* (West 2002)), and the Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/101 *et seq.* (West 2002)) on privacy, due process, equal protection, and *ex post facto* grounds. Relying on the privacy clause of article I, section 6, of the Illinois Constitution of 1970, he argued that while the registration requirement itself did not violate his right to privacy, the "wholesale dissemination" of his photograph and other information via the Internet was unreasonable. *Cornelius*, 213 Ill. 2d at 192. Such claims

require a twofold inquiry. First, the court must determine whether the party challenging a statute on privacy grounds has a reasonable expectation of privacy in the information he seeks to protect and, second, we must determine whether the statute unreasonably invades that expectation of privacy. *Cornelius*, 213 Ill. 2d at 193-94. We concluded that the defendant's claim failed the first part of the twofold inquiry. The defendant did not have a cognizable privacy interest in information that was already a matter of public record in the pre-Internet version of the sex offender registry. Although accessibility via the Internet may have made the information more widely available to the public, the information was not private and, therefore, did not come within the scope of the protection provided by the privacy clause of the Illinois Constitution. *Cornelius*, 213 Ill. 2d at 197, quoting *People v. Logan*, 302 Ill. App. 3d 319, 334 (1998). Further, unlike the uncharged targets of the grand jury investigation in *Will County Grand Jury*, the defendant had been convicted of aggravated criminal sexual abuse. The conduct that resulted in his conviction "lowered the privacy bar and culminated in a public record that contains the challenged information." *Cornelius*, 213 Ill. 2d at 198.

This line of cases employs a two-part framework for the consideration of a claim that a state statute or other state action violates the privacy clause of article I, section 6, of the Illinois Constitution of 1970. Cases in which the privacy clause has been found to apply have involved either private records or documents or information of the type typically contained therein or an invasion of the actual physical body of the person. None of these cases have involved a claim that an individual's constitutionally protected zone of privacy was violated by an investigative technique employed by the police that did not involve the taking of physical evidence from the body of the individual. Further, none of these cases involved police conduct during a routine traffic stop or other routine encounter with a member of the public.

Two cases involving just such claims are *Mitchell*, 165 Ill. 2d 211, and *Bolden*, 97 Ill. 2d 166. In *Mitchell*, 165 Ill. 2d at 216, this court applied the Supreme Court's decision in *Minnesota v. Dickerson*, 508 U.S. 366, 124 L. Ed. 2d 334, 113 S. Ct. 2130 (1993) (holding that the "plain feel" doctrine does not offend the fourth amendment), to conclude that the "plain

touch" doctrine comports with the search and seizure clause of article I, section 6, of the state constitution. We then turned to defendant's argument that a pat-down search falls within the scope of the right to privacy clause of article I, section 6, rather than within the scope of the search and seizure clause, because it involves a police officer laying hands on the body of a person. *Mitchell*, 165 Ill. 2d at 219. We recognized a certain "commonality of purpose" shared by the three clauses of article I, section 6, but noted that "[n]otwithstanding that commonality, each clause differs with respect to the conduct it was designed to prohibit." *Mitchell*, 165 Ill. 2d at 220. Further, although the touching of a person's body during a *Terry* stop and search "triggers right-to-privacy concerns generally, such conduct is more particularly a search and seizure issue." *Mitchell*, 165 Ill. 2d at 220. After examining the history of the privacy clause, we concluded that "the drafters intended no change in the categorization of conduct traditionally covered by the search and seizure clause." *Mitchell*, 165 Ill. 2d at 221. We held that the conduct at issue, a pat-down search by the police, "continues to fall within the bounds of the search and seizure clause," and we declined to extend the reasoning of *Will County Grand Jury* to reach it.

In *Bolden*, the defendant voluntarily appeared at the police station and participated in a lineup. He was identified by the witness and the lineup identification was admitted at trial, over defendant's objection that his constitutional rights were violated by the detectives' refusal to allow defense counsel to be present with the witness during the lineup. We rejected the defendant's fifth and sixth amendment claims (*Bolden*, 197 Ill. 2d at 175-77), and turned to his argument that refusal to allow his lawyer to observe the witness during the lineup converted his voluntary appearance into an involuntary seizure in violation of the fourth amendment (*Bolden*, 197 Ill. 2d at 177-78). He also argued that, even if he had not been seized for fourth amendment purposes, the police conduct nevertheless violated both the search and seizure clause and the privacy clause of article I, section 6, of the Illinois Constitution of 1970. We observed that the defendant had failed to distinguish between the two clauses and noted that "[w]hile the privacy clause of article I, section 6, possesses a unique constitutional history, it is of no assistance here to the defendant, for it is a separate

guarantee and does not serve to transform the nearby search and seizure clause into a source of state constitutional rights that are more extensive than those conferred by the fourth amendment." *Bolden*, 197 Ill. 2d at 179. Finally, we determined that the defendant had not been seized because his freedom to leave the police station was unrestricted until the lineup was concluded and he was placed under arrest. *Bolden*, 197 Ill. 2d at 181-82.

Reading these two groups of cases in conjunction, it is evident that the privacy clause of article I, section 6, may be implicated in the context of a criminal investigation. Whether physical evidence obtained from the body of the defendant is sought by a grand jury or obtained by the police during an investigation, the state's intrusion into the individual's bodily zone of privacy must be reasonable. With regard to noninvasive physical evidence, such as fingerprints, voice exemplars, and handwriting samples, a showing of relevance and of individualized suspicion must be made. *People v. Watson*, 214 Ill. 2d 271, 283 (2005), quoting *Will County Grand Jury*, 152 Ill. 2d at 393. When the state seeks physical evidence of a more intrusive nature, such as head, facial, or pubic hair, "where the compelled production would constitute a search or seizure under the fourth amendment," probable cause is required. *Watson*, 214 Ill. 2d at 283.

The privacy clause is also implicated if, in the course of a criminal investigation, the state seeks access to medical or financial records that are within the scope of the protections of article I, section 6. See, *e.g.*, *Will County Grand Jury*, 152 Ill. 2d at 396, citing with approval, *People v. Jackson*, 116 Ill. App. 3d 430, 434-35 (1983) (article I, section 6, assures citizens of a right of privacy in their bank records). In the present case, we are asked to determine whether having an officer circle a vehicle in the company of a trained narcotics-detection dog, while the dog sniffs the air in an effort to detect the presence of contraband, invades the zone of privacy established by article I, section 6. Defendant would have us treat the dog sniff as more like the taking of a physical specimen for analysis (as in *Will County Grand Jury*) than the performance of a routine pat-down (as in *Mitchell*) because it involves the government's use of a "device" that enhances ordinary human sensory perceptions.

The State responds that the dog sniff took place in the course of a routine traffic stop and is properly analyzed under traditional search and seizure principles, without any need to consider the privacy clause.

A dog sniff of an individual or of his vehicle or luggage does not reveal private medical information (*i.e.*, the presence prescription medications for the treatment of psychiatric disorders or sexually transmitted diseases), so it does not implicate the concerns at issue in *Kunkel*. A dog sniff will not reveal the contents of diaries or love letters; it will not reveal the individual's choice of reading materials, whether religious, political, or pornographic; it will not reveal sexual orientation or marital infidelity. Thus, it does not infringe on the zone of personal privacy that the drafters intended to protect. Properly conducted, a dog sniff will not result in the slightest touching of the individual, so the privacy concerns at issue in *Will County Grand Jury*, *King*, and *Fink*, are not implicated.

Indeed, once the dog sniff has been conducted, no search will ensue unless the dog alerts to the scent of illegal narcotics. Thus, the image suggested by *amicus* ACLU of the police searching an individual's luggage by the side of the road and exposing private matters to public view will not occur unless a dog sniff has revealed the presence of illegal narcotics. A person who chooses to transport contraband in his vehicle, knowing that its presence may be detected by a canine unit if he commits a traffic violation, has taken the risk of exposure during the ensuing search of whatever private materials he may have with him in the vehicle.

We conclude that the dog sniff of a vehicle does not constitute an invasion of privacy. It is, in fact, even less invasive or intrusive than the routine pat-down which, after all, involves the officer's physical contact with the clothing of the individual. Thus, the present case falls within the line of cases represented by *Mitchell* and *Bolden* and must be analyzed solely as a search and seizure issue. Given our limited lockstep approach to search and seizure analysis, the answer is clear. The sniff did not violate defendant's right to be free from unreasonable search and seizure. See *Caballes*, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838 ("the use of a

well-trained narcotics-detection dog–one that 'does not expose noncontraband items that otherwise would remain hidden from public view'–during a lawful traffic stop, generally does not implicate legitimate privacy interests" cognizable under the fourth amendment), quoting *United States v. Place*, 462 U.S. 696, 707, 77 L. Ed. 2d 110, 121, 103 S. Ct. 2637, 2644 (1983).

Reliability of the "Device" Employed in a Dog Sniff

The Supreme Court has "treated a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item.' " *Caballes*, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838, quoting *Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121, 103 S. Ct. at 2644. Such use of narcotics-detection dogs by the police has been described as a "binary search" or a "content-discriminating" search, because it yields only a yes-or-no answer, not an inventory of the contents of the vehicle or container being searched. See R. Simmons, *From Katz to Kyllo: A Blueprint for Adapting the Fourth Amendment to Twenty-First Century Technologies*, 53 Hastings L.J. 1303, 1348 (2002). In contrast, a technology or procedure that not only discloses criminal activity, but also lawful activity, is not content-discriminating. Use of such technology constitutes a search and, therefore, must pass muster under the fourth amendment. Thus, in *Kyllo*, 533 U.S. at 34-35, 150 L. Ed. 2d at 102, 121 S. Ct. at 2043, the Court held that the use of a thermal-imaging device to detect the presence of marijuana plants inside a home constituted an unlawful search. Because the device also revealed intimate details of conduct inside the home, such as "at what hour each night the lady of the house takes her daily sauna and bath," use of the device violated the occupants' legitimate expectation of privacy. *Kyllo*, 533 U.S. at 38, 150 L. Ed. 2d at 105, 121 S. Ct. at 2045.

Defendant argues that even if this court reaffirms its commitment to a lockstep approach and concludes that the privacy clause of article I, section 6, does not forbid the use of canine sniffs during routine traffic stops, this court should address (1) the reliability of the "device" used in this binary search, and (2) if it finds the device reliable, consider whether

the duration, degree, and nature of the intrusion in this case, coupled with all other conduct of the officers, constituted an illegal "seizure." The State responds that there is no basis for overturning the trial court's factual finding that the dog, Krott, was sufficiently reliable to provide the officers with probable cause to search the trunk of defendant's car.

One scholar has noted that "[i]n an ideal world, law enforcement officials would design devices that (1) only produced a binary response when used and conveyed no other information about the person or area searched; (2) were 100% accurate; and (3) that only responded when the individual possessed an item–narcotics, firearms, child pornography, etc.–that was clearly illegal." 53 Hastings L.J. at 1354. Without adopting these criteria, we consider their application to a dog sniff.

Clearly, the first of these criteria is met. The dog either alerts to the scent of illegal narcotics, or he does not. Even if the dog is capable of detecting the presence of other substances, he is not capable of communicating such information to the officer.

With regard to the third criterion suggested by Professor Simmons, defendant argues that a high percentage of circulating paper currency has been contaminated by drugs and that this circumstance leads to false positive results. If a narcotics-detection dog alerts to the mere presence of contaminated currency, a search will follow and private information about the individual may be exposed. The record, however, contains no evidence that supports either his general argument–that the rate of false positive results is unacceptable–or the specific argument that he was affected by a false positive result. Indeed, after hearing testimony regarding the particular dog involved in this case, the trial judge found that the dog sniff was sufficiently reliable to establish probable cause for the search of the trunk of defendant's car. This factual finding is not against the manifest weight of the evidence.

Turning to the second of Professor Simmons' criteria, defendant argues that the accuracy requirement cannot be met. Again, he points to the possibility of a false positive alert

and suggests that this court should be "suspicious" of all dog sniffs for this reason. Relying on an as-yet unpublished law review article that defendant did not append to his brief, he proposes that in each case where the prosecutor would rely on a binary search such as a dog sniff, the trial court should engage in a full evaluation of the method or technique. He analogizes this to a *Daubert*[1] hearing, "but with the State "held to a much higher standard"–a standard "high enough to ensure that the binary search doctrine's inevitable widespread indiscriminate application does not result in overwhelming numbers of unjustified searches of innocent subjects." He asks that this matter be remanded to the trial court for an evidentiary hearing on the accuracy of the dog-sniff technique.

Defendant's concerns about "widespread" abuse of the use of police canine units and "overwhelming numbers" of innocent subjects are pure speculation. The Supreme Court has not established such criteria, saying only that a canine sniff is permissible when the dog is "well-trained." *Caballes*, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838, quoting *Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121, 103 S. Ct. at 2644. On the record before us, we find no basis for concluding that the trial court's finding of reliability was manifestly erroneous.

Defendant also argues that by holding that a so-called binary search is not a search for fourth amendment purposes, the Supreme Court has merely legitimated a search based on an *ex post facto* examination of what the police actually find after the dog alerts and a full-blown search is conducted. He contends that by following this ruling in lockstep, this court is committing the same alleged error. As the professor upon

---

[1]Defendant refers to the standard established by the United States Supreme Court for the admission of scientific evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). In Illinois, however, the admission of expert testimony regarding scientific evidence is governed by the standard of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 80 n.1 (2002) (noting that this court has not considered adopting the new *Daubert* standard to replace the *Frye* standard).

whom defendant so greatly relies has noted, however, "[t]his objection misses the point entirely; a binary search is not constitutional because of what it does find, but because of what it is capable of finding." (Emphases omitted.) 53 Hastings L.J. at 1354, n.214.

Finally, we decline to address defendant's last argument–that he was illegally seized even if he was not illegally searched–because he devotes only two sentences to this topic. The only authority he cites for this proposition is this court's now-vacated opinion in *Caballes I*.

## CONCLUSION

Having given due consideration to the arguments of the parties and having reviewed, in detail, the history, purpose, and rationale of the lockstep doctrine as it has been applied in Illinois, we reaffirm our adherence to a limited lockstep approach to the interpretation of a provision of the Illinois Constitution of 1970 that is identical to or entirely synonymous with a provision of the United States Constitution. We further hold that a dog sniff of a vehicle during a routine traffic stop does not implicate the privacy clause of article I, section 6, of the Illinois Constitution of 1970. Finally, we hold that the evidence obtained as a result of the dog sniff was properly admitted in defendant's trial.

The judgment of the appellate court, which affirmed the circuit court's judgment, is affirmed.

*Appellate court judgment affirmed.*

JUSTICE FREEMAN, dissenting:

Today's opinion puts to rest the confusion that has animated our application of the "lockstep doctrine." As the court explains, various methods for construing provisions of individual state constitutions have been adopted by state courts. One such method, the lockstep doctrine, has been defined as follows:

> " 'Under the lockstep approach, the state constitutional analysis begins and ends with consideration of the U.S. Supreme Court's interpretation of the textual provision at issue. On this approach, federal rulings are regarded as having attained 'a presumption of correctness' from which the state should be loathe to part. In other words, congruence with federal decisional law is assumed to be the norm, and deviation is for all intents and purposes impossible.' " Slip op. at 20, quoting L. Friedman, *The Constitutional Value of Dialogue and the New Judicial Federalism*, 28 Hastings Const. L.Q. 93, 102-03 (2000).

In light of the numerous times this court has deviated from federal decisional law (see, *e.g.*, *People v. Krueger*, 175 Ill. 2d 60 (1996); *People v. Washington,* 171 Ill. 2d 475 (1996)), it is clear that this court has not truly followed in "lockstep" with the United States Supreme Court. I therefore agree with the court when it states that "it is an overstatement to describe our approach as being in strict lockstep with the Supreme Court." Slip op. at 21-22. Like my colleagues in the majority, I believe that the method this court has been applying throughout the years has been a form of the "interstitial approach." As the court explains, under this approach, the court first looks to whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined. Slip op. at 21, quoting *State v. Gomez*, 122 N.M. 777, 783, 932 P.2d 1, 7 (1997). This approach "acknowledges the United States Constitution as the basic protector of fundamental liberties and treats the federal declaration as the lowest common denominator in protecting those liberties." S. Pollock, *State Constitutions as Separate Sources of Fundamental Rights*, 35 Rutgers L. Rev. 707, 718 (1983).

A review of the instances in which this court has departed from federal law reveals that this court has done so for reasons that are commonly associated with this approach. A state court utilizing the interstitial approach "may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government,

or distinctive state characteristics." *Gomez*, 122 N.M. at 783, 932 P.2d at 7. In *Krueger*, the court implied strongly that it was departing from federal law because it believed the United States Supreme Court's analysis to be flawed. *Krueger*, 175 Ill. 2d at 72-73. In *Washington*, the court implied that it was necessary to recognize a constitutional basis in state *habeas corpus* jurisprudence for addressing actual innocence claims because federal law did not provide a forum for such a claim–this, of course, implicates the differences between the state and federal systems. *Washington*, 171 Ill. 2d at 489.

Notwithstanding my agreement with the court's conclusion that we are not a truly "lockstep" court, I believe this case to be one which necessitates our divergence from federal precedent. In my view, Justice Ginsburg's dissent reveals several serious flaws in the Court's decision. She points out that the Court's decision "diminishes the Fourth Amendment's force" by abandoning the critical step of the *Terry* analysis. *Illinois v. Caballes*, 543 U.S. 405, 421, 160 L. Ed. 2d 842, 855, 125 S. Ct. 834, 845 (2005) (Ginsburg, J., dissenting, joined by Souter, J.). Justice Ginsburg also criticizes the fact that the decision "undermines" the Court's "situation-sensitive balancing of Fourth Amendment interests in other contexts." *Caballes*, 543 U.S. at 423, 160 L. Ed. 2d at 856, 125 S. Ct. at 846. These criticisms are apt and compel me to the conclusion that divergence from the Supreme Court is necessary under the circumstances presented at bar.

I therefore would hold that the police action in this case violated defendant's right against unreasonable searches under article I, section 6, of the Illinois Constitution when, without cause to suspect wrongdoing, they conducted a dog sniff of his vehicle. In light of my position, I need not reach, nor do I express any view on, the question of whether the unreasonable invasion of privacy clause in the same section of our constitution is implicated in this case.

JUSTICES McMORROW and KILBRIDE join in this dissent.