No. 2-20-0532
Order filed August 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-86 |
| TERRANCE V. O'BRIEN, | ) ) ) | Honorable Ann Celine Walsh, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in dismissing defendant's post-conviction petition at second stage as he failed to make a substantial showing of a constitutional violation from the State's failure to disclose impeachment evidence prior to his pre-trial guilty plea.

¶ 2    Defendant, Terrence O'Brien, appeals from the second-stage dismissal of his petition for post-conviction relief pursuant to the Post-Conviction Hearing Act. 725 ILCS 5/122-1 (West 2018) (the Act). He contends on appeal that he is entitled to a third-stage hearing as his post-conviction petition made a substantial showing of a constitutional violation by arguing that the State, in failing

to disclose material discovery prior to entry of his guilty plea, violated his right to due process under the Illinois Constitution. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On January 13, 2013, defendant and two co-defendants, all Schaumburg police officers, were indicted for delivery of controlled substance, armed violence, calculated criminal drug conspiracy, official misconduct, theft, and burglary. On March 21, 2014, defendant pled guilty to unlawful delivery of a controlled substance, official misconduct, burglary, and armed violence. At the plea hearing, the State provided the following factual basis to the trial court.

¶ 5     Officers from the Carol Stream police department, the Du Page Metropolitan Enforcement Group, and the Drug Enforcement Agency (DEA) would testify that criminal informant, Michael Duran, told them that he had received drugs from defendant and his co-defendants. The law enforcement agencies obtained permission from the trial court to wiretap the phones of the co-defendants. On January 7, 2013, recorded conversations between co-defendant Matthew Hudak and Duran revealed information that defendant and co-defendant John Cichy were "picking up cannabis from other individuals" known to Duran. Further recorded conversations showed that the cannabis would be picked up "at a specific storage locker."

¶ 6     On January 8, 2013, recorded conversations between the co-defendants and Duran indicated that co-defendant Hudak would meet with Duran later that day to drop off cocaine and collect money Duran owed to Hudak. Hudak was watched by investigators when he went to Duran's apartment and "put $5,000 on the kitchen table, count[ed] it, and discuss[ed] the division of that money, including the part of it [that] would go to [defendant]." Hudak then asked Duran if he "still needed three to four ounces of cocaine to sell for [the co-defendants]" and then told Duran he would bring the cocaine to him later on January 8, 2013.

¶ 7    Subsequent conversations between Hudak and defendant occurred about obtaining the cocaine to give to Duran. According to the State, investigating officers observed defendant and Hudak as they went to a fourth co-defendant's home. While there, they went into her garage and removed some items before going back to Duran's apartment and gave him a "blue, plastic glove, inside of which were several plastic bags with a white chunky substance[.]" Tests from the Du Page County Crime Lab confirmed the substance to be cocaine, "more than 100 grams, but less than 400 grams."

¶ 8    Defendant and his co-defendants, Hudak and Cichy, were members of the Schaumburg tactical narcotics unit. All were on duty at the time of the drug exchange. Defendant was said to be acting in his official capacity on January 8, 2013, when "as a side detour, he delivered these drugs with [Hudak] to the informant."

¶ 9    Hudak further discussed ripping off drugs from one of Duran's friends by feigning an FBI investigation. They discussed how they would obtain the drugs from the friend and keep them in a storage locker. On January 11, 2013, Hudak told Duran that a storage locker had been found to use in the plan to rob Duran's friend. Law enforcement investigators heard defendant and his co-defendants "talking and they were actually at the storage unit locker and talking to one another."

¶ 10    Law enforcement investigators had installed surveillance equipment at the storage unit. Additionally, investigators had left "Official Advanced Funds" in the storage unit instead of narcotics. On January 12, 2013, investigators observed defendant and his co-defendants come to the storage locker. They arrived "masked" and were driving "Schaumburg police tactical vehicles that these defendants had been using, a silver Dodge Caravan and a silver Honda." While in the storage unit, defendant and his co-defendants opened items and took everything from inside, left a piece of paper, closed the storage unit door and left. A short time later, agents observed defendant

and his co-defendants return to the storage locker, drop some items, and remove the piece of paper. Later, they returned and took everything and left again. Hudak texted Duran later that night indicating that he and his co-defendants had recovered $20,000 from the storage locker. The $20,000 was made up of official marked funds by the investigating agents.

¶ 11     On January 16, 2013, investigating agents recovered $5,000 of the marked funds from the storage locker at each of the three co-defendants' residences. The remaining funds were recovered from Hudak's residence as well as other items that were inside the storage locker. Defendant was arrested and confessed his involvement, saying he did it for "the thrill of it," and had no financial problems. Defendant stated that he obtained the cocaine from the execution of a search warrant before he and his co-defendants broke it up, "added bunk," and kept what remained. Defendant stated that he stored four ounces of cocaine at the residence of the fourth co-defendant. He retrieved the cocaine from that residence before giving it to Hudak to give to Duran to sell. The State further offered in its factual recitation that defendant "also admitted specific details with regards to everything else."

¶ 12     Defendant's counsel stipulated to the State's proffered factual basis. The trial court found that defendant's guilty plea had been entered knowingly and voluntarily. The trial court sentenced defendant to (1) nine years' imprisonment for unlawful delivery of a controlled substance, served at 75 percent; (2) five years' imprisonment for official misconduct, served at 50 percent; (3) five years' imprisonment for burglary, served at 50 percent; and (4) 19 years' imprisonment for armed violence, served at 50 percent. Defendant made no motion to withdraw his guilty plea and filed no direct appeal.

¶ 13     On April 24, 2018, defendant filed a verified petition for post-conviction relief pursuant to the Act. The petition alleged that on February 12, 2018, defendant learned for the first time that

the case against co-defendant Cichy was to be dismissed on February 13, 2018, "due to discovery violations by the State's Attorney's Office following the indictment in 2013." Defendant's petition acknowledged that it was filed beyond three years from the date of his guilty plea but alleged that he had "just learned the details of the dismissal and the reasons why it occurred."

¶ 14     Defendant described in the petition that, following the dismissal of co-defendant Cichy's indictment on February 13, 2013, the State tendered documents to defendant that had not previously been disclosed. The documents indicated "that the confidential informant, Michael A. Duran Mathieu, was suspected of money laundering and theft of specific property and was the subject of an active investigation in the months following the arrest of [defendant] and his co-defendants[.]" Defendant alleged that this information about Duran was known to the Du Page County State's Attorney's Office, as well as the law enforcement entities involved in defendant's arrest. Defendant alleged that the Carol Stream police notified the State that they would allow Duran to "work off" the charges in exchange for providing information to be used against defendant.

¶ 15     Police reports indicated that Duran was the "lone suspect" in a theft case in October 2012, before the case was closed in December 2012. The alleged theft involved a stolen treadmill from Ideal Fitness, a facility where Duran was a former employee. A police report dated March 11, 2013, regarding Duran's alleged theft of property stated, "no charges will be filed in this case due to lack of evidence and probable cause." On March 12, 2013, a confidential informant notified Carol Stream police that Duran stole a treadmill and sold it to a married couple. The treadmill was located that afternoon at the couple's home. On March 18, 2013, a Carol Stream police report indicated that charges were pending in connection with stolen treadmill. The treadmill was ultimately donated to the Carol Stream Fire Protection District in April 2013. The approval of the

treadmill's donation was overseen by Audriana Anderson, Du Page County Assistant State's Attorney and head of the Du Page County State's Attorney's narcotics unit and "directly involved in all aspects of [defendant's] investigation including personally signing certain documents related to the eavesdropping orders that were entered and was considered lead attorney for [defendant's] case." Duran later admitted to having stolen the treadmill and selling it to the couple. However, on March 16, 2015, a Carol Stream police report was filed stating that "no criminal charges will be filed" against Duran for theft over $500. The report further noted "Case closed – Prosecution Declined."

¶ 16    A March 2013 Carol Stream police report stated there was a drug investigation involving Duran and the married couple. The investigation began after a traffic stop in Kane County in October 2012, in which the married couple were arrested after police found a large quantity of cannabis in their car. Duran was present during the stop and taken into custody "on suspicion of cannabis trafficking." However, according to the police report, "[U]ltimately, charges were not approved for Duran in regards to that investigation."

¶ 17    Defendant's post-conviction petition further alleged that Duran was being investigated for wire fraud in May 2013. Duran had allegedly collected credit card information from members of the gym at which he was employed and set up false accounts with banking institutions and transferred money into his own accounts. On March 16, 2015, a Carol Stream police report indicated that "no criminal charges will be filed" against Duran. The report further noted "Case closed – Prosecution Declined."

¶ 18    The information regarding the investigation into Duran's alleged money laundering and theft was not tendered to defendant until February 2018.

¶ 19    Defendant's post-conviction petition claimed that the failure by the State to disclose Duran's unlawful conduct prior to the entry of his guilty plea violated his rights under both the United States and Illinois constitutions to (1) due process; (2) confront witnesses; (3) make an informed decision to plead guilty or proceed to trial; and (4) knowingly, voluntarily, and intelligently plead guilty. Further, defendant alleged that ASA Anderson's conduct in withholding that evidence "was a direct violation of her duties and obligations under the Illinois Rules of Discovery, Code of Professional Conduct, and ABA standards for prosecutors." Defendant averred that Anderson's conduct "was so egregious and willful as to violate [defendant's] due process rights as guaranteed under the Illinois and United States Constitution and warrants a dismissal of said charges."

¶ 20    On June 7, 2018, the trial court advanced defendant's petition to a second stage proceeding. On October 30, 2018, defendant filed an amended post-conviction petition. Therein, he acknowledged that his petition was filed more than three years after his guilty plea, but argued that it was still timely because he only recently learning about the dismissal of Cichy's case and the reasons for its dismissal. Relevant here, defendant's amended post-conviction petition made the following claims regarding the State's failure to divulge certain discovery information prior to his guilty plea labeled A, B, C, D, and I:

> "A. [Defendant's] plea of guilty was not knowing, voluntary, or intelligently made and was secured through fraud and deception by the State's Attorney's Office and police.
>
> ***
>
> B. The deliberate actions of the Assistant State's Attorney and police warrant a dismissal.
>
> ***
>
> C. Not all exculpatory evidence has been tendered to [defendant].

\*\*\*

D. [Duran] was given benefits and promises which were not disclosed.

\*\*\*

I. That the police drafted conflicting reports, failed to properly investigate a money laundering scheme by [Duran] or notify his victims, failed to seek charges against [Duran] for a theft of a treadmill, and thereby committed violations of its own department policies of official misconduct, all in an attempt to protect [Duran] and prevent [defendant] from receiving exculpatory information."

¶ 21    On April 10, 2019, the State filed a motion to dismiss, arguing that defendant's petition was untimely, that several claims were barred by forfeiture, and that defendant failed to make a substantial showing of a constitutional violation.

¶ 22    On February 28, 2020, the trial court issued a written ruling granting the State's motion to dismiss. Regarding the claims relevant to this appeal, the trial court found that "the State arguably engaged in skullduggery," but "there are no reported decisions providing that a violation of our discovery rules, standing alone, would allow a defendant to withdraw an otherwise voluntary plea of guilty." The trial court relied on *United States v. Ruiz*, 536 U.S. 622, to support its finding that the United States Constitution does not require the disclosure of impeachment evidence during plea bargaining. The trial court declined to interpret the Illinois Constitution's due process clause more broadly than was articulated in *Ruiz*, as "[t]he two due process clauses are virtually identical, and there appears to be no unique state history or state experience that justifies a departure from federal precedent."

¶ 23    On March 26, 2020, defendant filed a motion to reconsider the dismissal of his amended petition. The motion was denied on September 15, 2020. Defendant then timely filed this appeal.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, defendant contends that the trial court erred in granting the State's motion to dismiss his amended post-conviction petition. Defendant argues that he made a substantial showing of a constitutional violation by arguing that the State, in failing to disclose material discovery prior to entry of his guilty plea, violated his right to due process under the Illinois Constitution.

¶ 26    The Act creates a three-stage process for the adjudication of post-conviction claims in non-capital cases. *People v. Harris*, 224 Ill. 2d 115, 125 (2007). At the first stage, the circuit court must review the petition within 90 days of its filing and determine whether it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016); see also *People v. Allen*, 2015 IL 113135, ¶ 24 (explaining that a first-stage dismissal is inappropriate if a petition alleges sufficient facts to state the "gist of a constitutional claim"). If the petition is not summarily dismissed at the first stage, it advances to the second stage, where an indigent petitioner is entitled to appointed counsel, the petition may be amended, and the State may answer or move to dismiss the petition. 725 ILCS 5/122-4 (West 2012).

¶ 27    At the second stage, the petitioner bears the burden of making a "substantial showing of a constitutional violation." *People v. Domagala*, 2013 IL 113688, ¶ 35. In other words, the petitioner must show that he would be entitled to relief if his well-pleaded allegations of a constitutional violation were proved true. At second-stage proceedings, the trial court may grant the State's motion to dismiss in full or in part. *People v. Cabrera*, 326 Ill. App. 3d 555, 564 (2001). We review the dismissal of a post-conviction petition without an evidentiary hearing *de novo*. *People v. Whitfield*, 217 Ill. 2d 177, 182 (2005).

¶ 28     Defendant argues here that neither the holding in *Ruiz* nor this court's adoption of that holding in *People v. Gray*, 2016 IL App (2d) 100042, applies to the facts of this case. He avers that *Ruiz* and *Gray* do not preclude this court from finding that the State's purposeful withholding of impeachment evidence prior to his guilty plea, which defendant characterizes as "significant discovery information," constitutes a violation of his due process rights under the Illinois Constitution.

¶ 29     In *Ruiz*, the defendant was charged with a drug offense under which the government offered her a "fast track" plea bargain to which she would waive an indictment, trial, and appeal in exchange for a downward departure from otherwise applicable sentencing guidelines. *U.S. v. Ruiz*, 536 U.S. 622, 625-26 (2002). The government also insisted that the defendant agree to waive her right to impeaching information related to informants or other witnesses. *Id*. Defendant refused to agree to this waiver and the government's "fast track" offer was withdrawn. *Id*. Defendant pleaded guilty and was sentenced under the standard guidelines and defendant appealed. *Id*. The Supreme Court, in finding the "fast track" agreement lawful, noted that, when a defendant knowingly and voluntarily pleads guilty, he or she waives the right to a fair trial and other constitutional rights. *Id*. at 628-29. The Supreme Court analyzed the issue as "whether the [U.S.] Constitution requires preguilty plea disclosure of impeachment information." *Id*. The Court found that the U.S. Constitution does not require any such disclosure. *Id*.

¶ 30     The Supreme Court emphasized the difference between a trial, to which *Brady* applies, and a guilty plea. The Court found that *Brady* is concerned with the "fairness of a trial" which is not equivalent to "whether a plea is voluntary." *Id*. "[T]he Constitution does not require the prosecutor to share all useful information with the defendant." *Id*. Further, the Court explained that the Constitution "does not require complete knowledge of the relevant circumstances," and a

defendant's ignorance of the possible grounds on which to impeach potential witnesses at a possible trial was difficult to distinguish from many other "forms of misapprehension" that would not prevent him from entering a valid guilty plea. *Id*.

¶ 31    The Court found that due process considerations were not a conclusive factor in favor of recognizing a defendant's right to be told of potentially impeaching evidence before pleading guilty because the value of "a constitutional obligation to provide impeachment information during plea bargaining, prior to the entry of a guilty plea," would be limited and could interfere with the government's ability to a secure guilty plea that is factually justified, conducive to judicial efficiency, and desired by the defendant himself. *Id*. at 631. The Court went on to ultimately hold:

> "These considerations, taken together, lead us to conclude that the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Id*. at 633.

¶ 32    This court adopted the Supreme Court's *Ruiz* holding in *Gray*. In *Gray*, the defendant was indicted for possession of cocaine with intent to deliver and possession of cannabis with intent to deliver. *People v. Gray*, 2016 IL App (2d) 140002 ¶ 2. The indicted offenses occurred when police executed a search warrant on the defendant's apartment based on information received from a confidential informant. *Id*. The warrant was supported by a complaint from Matthew Hudak, ironically one of defendant's co-defendants. *Id*. Following the defendant's motions to quash his arrest and suppress evidence, the State entered an agreement with defendant, under which the defendant would plead guilty to a single amended count of possession of cocaine with intent to deliver in exchange for a recommended 12-year prison term. *Id*.  ¶ 6. The defendant pleaded guilty and did not file a direct appeal. *Id*.

¶ 33   Subsequently, the defendant filed a post-conviction petition alleging that he pleaded guilty despite his belief that his pretrial motions had a reasonable chance of success, because he thought the three police officers would be deemed more credible than he at trial. *Id.* ¶ 8. The defendant alleged that he later discovered while serving his sentence that the three officers had each been indicted for the crimes detailed in the present case. *Id*. The defendant's petition alleged that the officers "committed and/or were committing the *** offenses during their investigation of [defendant]." *Id*.  He further alleged that, had he been aware of these offenses, he would have moved forward with his pretrial motions, gone to trial, and not pled guilty. *Id.*

¶ 34   In upholding the dismissal of defendant's post-conviction petition, this court held that: "under *Ruiz*, *Brady* does not require the disclosure of potential impeachment evidence before a defendant pleads guilty. Thus, with no *Brady* violation, defendant's plea was not tainted, and the petition was insufficient." This court concluded that:

> "*Ruiz* controls this case and *** defendant's *Brady* claim is legally baseless. Without a doubt, the evidence at issue was impeaching and not otherwise exculpatory: the alleged misdeeds of the three police officers did not involve the facts of this case or any conduct in which defendant participated. Defendant's attempt to limit *Ruiz* to the validity of a waiver of *Brady* rights as part of a plea bargain is unavailing ***. Moreover, as we read *Ruiz*, the primary reason that the Court saw no constitutional infirmity in requiring a waiver of the *Brady* right was that the purported right did not really exist: *Brady* did not require the State to disclose the impeachment information at issue, so the alleged 'waiver' was illusory." *Id.* ¶ 28.

¶ 35   Defendant in the present case does not take issue with the holding in *Ruiz* or this court's adoption of that holding in *Gray*. He concedes that the United States Constitution's due process

clause does not provide any right to receive impeachment evidence prior to the entry of a guilty plea. However, defendant argues that the language of the due process clause in the Illinois Constitution provides protection from the State's withholding of that same impeachment evidence, and that such a reading of that clause is not precluded by *Ruiz* or *Gray*. This assertion is unavailing.

¶ 36 The Illinois Constitution's due process and equal protection clause states that "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2. This language is identical to that of the due process clause contained in the Fourteenth Amendment of the United States Constitution, which states that no State shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV.

¶ 37 Jurisprudence under the Illinois Constitution follows the limited lock step doctrine. *People v. Caballes*, 221 Ill. 2d 282, 310 (2006). Under this approach, our reviewing courts will "look first to the federal constitution, and only if federal law provides no relief turn to the state constitution to determine whether a specific criterion-for example, unique state history or state experience-justifies departure from federal precedent. *Id.* at 309.

¶ 38 For reviewing courts in Illinois to construe the Illinois Constitution as providing greater protection than the U.S. Constitution under the limited lock step doctrine,

> "We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." *Id.* at 310, quoting *People v Tisler*, 103 Ill. 2d 226, 245 (1984).

¶ 39 This court is unable to identify any unique state history or state experience to justify a departure from federal precedent based on the facts presented in this appeal. This court's holding in *Gray* expressed our agreement with the United States Supreme Court's holding in *Ruiz* that defendant's due process rights were not violated by the State's failure to disclose impeachment evidence prior to his guilty plea. While we are not endorsing the State's pre-trial discovery tactics, the identical due process language of our constitution and the U.S. Constitution, when coupled with a lack of unique state history to justify a departure from that language, compels this court to apply our holding in *Gray* to that of the present case. In doing so, this court is applying the principle of *stare decisis*, which "expresses the policy of the courts to stand by precedents and not to disturb settled points." *Caballes*, 221 Ill. 2d at 313.

¶ 40 Based on the foregoing, defendant's pre-trial guilty plea foreclosed the due process claims raised in his amended petition, and defendant failed to illustrate a substantial showing of a constitutional violation. The trial court correctly granted the State's motion to dismiss.

¶ 41                                     III. CONCLUSION

¶ 42 We affirm the judgment of the circuit court of Du Page County.

¶ 43 Affirmed.